LEAVITT, receiver of the North American Trust and Banking Company, *vs.* BLATCHFORD and others.

Banking associations, organized under the act to authorize the business of banking, passed April 18, 1838, are corporations ; and the general laws relating to moneyed corporations apply to associations of that nature.

Accordingly *held* that the provisions of the revised statutes prohibiting the directors of a moneyed corporation from applying any portion of the funds of their corporation, except surplus profits, to the purchase of shares of its own stock, and declaring that no conveyance, assignment or transfer, nor any payment made, judgment suffered, lien created, or security given by any such corporation when insolvent or in contemplation of insolvency, with the intent to give a preference to any particular creditor, shall be valid, are applicable to associations under the general banking law.

Although it is a fundamental rule that every law must be construed according to the intention of the makers, that intention is never resorted to for any other purpose than to ascertain what they in fact intended· *to do*, and not for the purpose of ascertaining what they *have done. Per* EDWARDS, J.

Where a contract grows immediately out of, and is connected with, an illegal or immoral act, it cannot be enforced. But if the promise is entirely disconnected

VOL. V.                    2

Leavitt *v.* Blatchford.

with the illegal act, and is founded on a new consideration, it is not affected by the illegality of the act, although it was known to the party to whom the promise was made.

A promise made in consideration of a loan to enable the borrower to pay an illegal debt, does not arise out of an illegal transaction, and is not connected with it; and the maxim *ex turpi causa non oritur actio* does not apply; unless the statute makes the payment of such debt illegal.

Although the general banking law gives no power to banking associations, in express terms, to borrow money, yet as such an association may become indebted in the exercise of its undoubted legitimate business, it has, as a necessary incident, the power to borrow money for the purpose of paying its debts.

It is a general fundamental principle that when a right is given, all powers necessary to the exercise and enjoyment of the right are also given.

A banking association is liable for the payment of money borrowed for its use, upon a letter of credit signed by the president in pursuance of a resolution passed by the proper committee of the board of directors, although there is no written contract for repayment signed by the president or vice president, and cashier.

Under the articles of association and by-laws of the North American Trust and Banking Company the committee of the board of directors, on investments and finance, had the power to authorize the execution of an agreement and trust deed, by the president and cashier of the company, to secure the repayment of a loan made to the company.

Under the provisions of the act of May 14, 1840, declaring that no banking association shall issue or put in circulation, any bill or note of such association, unless the same shall be payable on demand without interest, promissory notes given by a banking association, payable after date, are illegal and void; even though they were not intended to circulate, and are incapable of circulating, as money.

Although notes of a banking association, thus issued, are void, yet the original indebtedness, of which they are the evidences, remains; and a deed assigning property in trust, as collateral security for the payment of the debt, is valid.

It is a well settled principle of law that if there are different and distinct undertakings in the same contract, some of which are legal and some illegal, the law will sustain the good, and make void only the bad. *Per* EDWARDS, J.

Where there is a security given for the payment of a debt, although the security may be illegal and void, yet if in the same instrument there is a contract to pay the debt, the contract may be enforced. *Per* EDWARDS, J.

IN EQUITY. The bill in this cause was filed for the purpose of having certain promissory notes purporting to be made by the North American Trust and Banking Company, and payable to the defendants Palmers, Mackillop, Dent & Co., in London, one year after date, set aside and declared void; and to set aside a deed assigning to the defendants Blatchford and

Murray, certain securities in trust, to secure the payment of the promissory notes. The facts are stated in the opinion of the court.

*G. N. Titus & Geo. Wood*, for the plaintiff.

*Wm. Kent & C. O'Conor*, for the defendants.

*By the Court*, Edwards, J. The receiver of the North American Trust and Banking Company asks the aid of this court, sitting in equity, to set aside and declare void forty-eight promissory notes, made in the name of the company, and signed by its president and cashier, in the sum of £1000 each, with interest, payable twelve months after date; and also to set aside an agreement, or trust deed, executed under the seal of the company, and signed by its president and cashier, whereby the company assigned certain stocks, bonds and mortgages in trust to secure the promissory notes. The ground on which the plaintiff claims relief is, that the notes and deed were made and executed in violation of the laws of this state, and are void. The statutes on which he mainly relies are applicable to moneyed corporations only. The first question then to be considered is, whether the North American Trust and Banking Company, being an association organized under the act to authorize the business of banking, passed April 18, 1838, was a corporation, within the letter and spirit of the statutory provisions referred to.

The numerous decisions which have been made in reference to banking associations have established, beyond a doubt, that the company in question was a corporation. ( *Warner* v. *Beers*, 23 *Wend.* 103. *The People* v. *The Assessors of Watertown*, 1 *Hill*, 616. *The Supervisors of Niagara* v. *The People*, 7 *Id.* 504. *Gifford* v. *Livingston*, 2 *Denio*, 380.) This was not disputed on the argument. But it was contended that it was not a corporation, in every acceptation of the term, and within the spirit and meaning of all the general laws applicable to moneyed corporations.

In the case of *Warner* v. *Beers*, which was the first adjudi-

cated case on the subject, it was held, and the same doctrine was reaffirmed in the case of *Gifford* v. *Livingston,* that banking associations under the act of 1838, although corporations, were not such within the constitutional provision requiring the assent of two-thirds of each branch of the legislature to the creating any body politic or corporate. The reason given for the decision was, that the general banking law did not secure exclusive privileges to any particular class of citizens, which might not be enjoyed in the same manner by all others. In other words, that banking associations were not monopolies— and that it was to institutions of that character that the constitutional restriction was intended to apply. This decision establishes the principle that banking associations are not corporations within the meaning of the fundamental law of the state. The question then arises whether they are such within the meaning of its general statutory laws.

The acts which are invoked by the plaintiff, in support of his claim to the relief sought, are first that which declares that " it shall not be lawful for the directors of any moneyed corporation to apply any portion of the funds of their corporation, except surplus profits, directly or indirectly, to the purchase of shares of its own stock." (1 *R. S.* 589, § 1, *sub.* 5, 1*st ed.*) And second that which declares that " no conveyance, assignment or transfer, nor any payment made, judgment suffered, lien created or security given by any such corporation when insolvent or in contemplation of insolvency, with the intent to give a preference to any particular creditor over other creditors of the company, shall be valid in law." (1 *R. S.* 791, § 9, 1*st ed.*)

These statutes were passed before the act of 1838, and it is contended on the part of the defendants that they do not apply to corporations organized under that act, because, in the first place, the legislature, at the time of the passage of the general banking law, intended to create a legal existence which would not be a corporation, and believed that it had done so—and that therefore it could not have intended that the general laws applicable to moneyed corporations should apply to banking associations ; and in the second place, because there are some pro-

visions contained in the act of 1838, applicable to subjects similar to those provided for in the general laws in reference to moneyed corporations, and that upon the principle that *expressio unius est exclusio alterius*, the correct legal inference is, that all the other provisions, not embraced in the act of 1838, were not intended to apply to associations under that act.

In reference to the first ground, although it is a fundamental rule that every law must be construed according to the intention of the makers, still that intention is never resorted to for any farther purpose than to ascertain what they in fact intended *to do*, and not for the purpose of ascertaining what they *have done*; or, to apply the principle to this case, we must look to the intention of the legislature to ascertain what powers have been given to banking associations by the general banking law. But the intention of the legislature cannot govern in ascertaining what shall be the legal effect of such powers; neither is it to be resorted to for the purpose of ascertaining what is the proper legal name and description of an association possessing the powers granted. When the question was before the court for the correction of errors, there was no doubt as to the extent of the powers possessed by banking associations: the only question was as to which class of legal existences bodies with such powers properly belonged. The court decided that they were corporations; that is, that the thing which the legislature intended to create, and did create, was, according to the correct legal construction, a corporation. Now, the legislature which passed the general laws in reference to moneyed corporations intended that they should apply to all associations which came within that description. The legislature that passed the act of 1838 did not, by any provision in that act, exclude associations created under it from the operation of the general laws. It was intended then that those laws should be applicable to banking associations, if, according to correct legal interpretation, they come within the meaning of moneyed corporations.

As to the second ground taken by the defendants, there is no doubt that the general principles stated are correct; but in

Leavitt *v.* Blatchford.

order to bring the case within those principles, it must appear that the provisions contained in the act of 1838 are so far inconsistent with the provisions of the general law, that there is a clear intention to exclude banking associations from its operation. There is nothing in the act of 1838 which is either expressly or by implication inconsistent with the general law in reference to assignments by moneyed corporations. The principle laid down, then, does not apply to the provision of the statute on that subject; but it is contended that the section of the general law which forbids the purchase of shares of its own stock, by a moneyed corporation, was intended to be superseded by the provisions of the act of 1838, which declares that "if any portion of the original capital of any banking association shall be withdrawn, for any purpose whatever, while any debts of the association remain unsatisfied, no dividends or profits on the shares of the capital stock of the association shall thereafter be made until the deficit of capital shall be made good; and if it shall appear that any such dividends have been made, it shall be the duty of the chancellor to make the necessary orders and decrees for closing the affairs of the association." (*Laws of* 1838, *p.* 252, § 28.) This provision is not inconsistent with the section above cited from the general law, which prohibits the purchase of shares of its own stock by a moneyed corporation; on the contrary, it is not strictly in reference to the same subject matter, and it seems to have been intended to provide against a mischief of a different character. One law was intended to prevent the purchase by a moneyed corporation of shares of its own stock, except from its surplus funds—the other was intended to prevent a dividend by a banking association after any portion of its capital stock should be withdrawn, and while any of the debts of the association remained unsatisfied.

But to remove all doubt upon the subject, it seems to me that it is now settled by authority, that the general laws in reference to moneyed corporations must apply to banking associations. In the case of *Warner* v. *Beers*, it is true that it was held that banking associations were not corporations, within the spirit

and meaning of the constitution. But in all other respects, when the question has arisen, they have been held to be corporations. In the case of *The People* v. *The Assessors of the village of Watertown,* it was decided by the supreme court that they were moneyed corporations within the meaning of the statute which declares that moneyed corporations deriving an income from the capital, or otherwise, shall be liable to taxation. (1 *R. S.* 414, § 1, 1*st ed.*) In the case of *The Supervisors of Niagara* v. *The People,* a similar doctrine was laid down by the court for the correction of errors. *In the matter of the Bank of Dansville,* (6 *Hill,* 370,) in which an application was made for the summary interference of the court to set aside an election of directors by a banking association, the court also held that generally the laws in reference to moneyed corporations applied to banking associations, although they held that, in that case, the general law in reference to the election of officers of moneyed corporations (1 *R. S.* 598, § 47 *to* § 50) could not be made applicable to banking associations, owing to the peculiar character of their organization. It follows, then, as a conclusion, that both upon principle and authority, the statutes which have been referred to in relation to moneyed corporations, and which are relied upon by the plaintiff as one of the grounds on which he claims the aid of this court, are applicable to associations under the general banking law.

The next question which arises is, whether the promissory notes and trust deed were founded on a legal valid consideration. It is contended on the part of the plaintiff that the money lent by Palmers, Mackillop, Dent & Co. to the North American Trust and Banking Company, and which formed the consideration of the instruments in question, was used by the company for the purpose of purchasing shares of its own stock, in violation of the provisions of the statute above cited; and that Palmers, Mackillop, Dent & Co., at the time of the loan, knew of the purpose to which the money was to be applied. I shall assume in the first place, in compliance with the views that have already been expressed, that if such a purchase of stock as is alleged, was made by the company in any other

manner than out of its surplus funds, the act was illegal—and I shall farther assume that the plaintiff in this suit, who represents the creditors of the association, has the right to set up such illegality.

There are two questions then to be considered. 1. Whether the money lent was used as is alleged ; and, 2. Whether the loan was made with knowledge, on the part of the lenders, of the uses and purposes to which the money was to be applied. As these are questions of fact, it will be necessary to inquire into the circumstances connected with the loan, and to consider the manner in which it was made.

It appears from the proofs that, shortly after the organization of the North American Trust and Banking Company, Shaw, a London banker, was in the city of New-York attending to the business of the house of which he was a member. It farther appears that, while here he addressed a letter to Palmers, Mackillop, Dent & Co., at London, in which, after representing with great earnestness the valuable services which he supposed would be rendered by the North American Trust and Banking Company in assisting the suspended houses, and in alleviating the commercial distress of the country, he introduces the company to the confidence of his London friends and correspondents. Upon this introduction, a business intercourse between the parties commenced. At the time when the banking company had completed its organization, it was supposed that by the sale of its own stock it could place itself in a condition to carry on the banking operations for which it had been formed. In this expectation it was disappointed ; and in order to meet its liabilities, it sent state stocks, which it had purchased to a very large amount, to England, for sale. Palmers, Mackillop, Dent & Co., were the bankers through whom a portion of these stocks were sold, and who were also employed by the company in other transactions connected with its foreign business. These relations continued until about the fourth day of April, 1840, when bills of exchange to the amount of £33,500, drawn upon Palmers, Mackillop, Dent & Co., were presented to them for acceptance. These bills had no connection with

any previous transactions between the parties. They were not drawn upon any funds which the banking company had in the hands of the drawees, nor upon any existing credits, and owing to accidental causes, they were not accompanied with any letter of explanation. Under these circumstances, acceptance of the bills was refused, and they were noted for non-acceptance. On the 6th of April, in the same year, a letter was received from Beers, the president of the banking company, bearing date the 2d of March, 1840, in which he stated that the company had authorized a credit in favor of Thos. E. Davis, for £16,875, the bills to be drawn at ninety days' sight, and to be renewed in case certain bonds in the hands of Palmers, Mackillop, Dent & Co. should not have been previously cashed. The letter speaks in high terms of the wealth, respectability and prudence of Davis, and refers to their " mutual friend " Fletcher Wilson, for an explanation of the motives which had induced the company to grant the credit, and of the advantages which might be expected to accrue from it. Upon the strength of this letter and of representations which were made to Palmers, Mackillop, Dent & Co., by a friend in London, as to the wealth of Davis, they resolved to accept the bills, and afterward did so, and finally, after two renewals, paid them in full. It is alleged, on the part of the plaintiff, that these bills were drawn for the purpose of enabling the company to purchase five thousand shares of its own stock ; and it is also alleged that this fact was known to the drawees at the time of their acceptance of the bills. The first question to be considered is whether the bills were drawn and accepted for the purpose and in the manner alleged.

It appears by the testimony of Strong, who was one of the directors of the company, and who is the principal witness on the part of the plaintiff, that on the 28th of February, 1840, the company purchased five thousand shares of its own stock. It farther appears that, in order to make such purchase, two sets of bills were drawn ; the first set upon Palmers, Mackillop, Dent & Co., in favor of Huth & Co., and other bankers in England ; and the second set upon Huth & Co. and the other

Leavitt *v.* Blatchford.

houses in whose favor the first set of bills had been drawn; the second set of bills having been drawn against the anticipated acceptances of the first. The second set of bills was sold in the city of New-York, and it was with the proceeds of such sale that the stock in question was purchased. It appears, then, that the stock was not purchased by the bills drawn on Palmers, Mackillop, Dent & Co., but that it was purchased with the proceeds of other bills; and that the whole transaction had been completed not only before Palmers, Mackillop, Dent & Co. knew of it, and before the bills drawn upon them were accepted, but before they had been sent from this country. It was contended, however, on the part of the plaintiff, that although Palmers, Mackillop, Dent & Co. had no knowledge of the purchase before it was completed—still that Fletcher Wilson was their agent, and that he had notice of the intended stock transaction at the time when the bills were drawn, and sanctioned it as such agent.

The first inquiry here is, whether Wilson was the agent of Palmers, Mackillop, Dent & Co. It seems to me that the proof shows beyond a doubt that he was not. The answer of Palmers, Mackillop, Dent & Co., which, in this respect, is responsive to the bill, unequivocally and positively denies such agency. There is no evidence that he was expressly authorized to act as agent, or that he was expressly acknowleged as such. Neither does the testimony of Strong or Davis, the two witnesses who are relied on for this purpose, show any act from which the agency of Wilson can be implied. It is evident, too, that the company did not consider him an authorized agent. They never treated him, in the transactions, as if they so regarded him. The letter of Beers does not pretend that Wilson had authorized, or that he had any right to authorize, the drawing of the bills of exchange to which the letter alludes. He is spoken of as "our mutual friend," to whom Beers refers for explanations which he thinks will satisfy the drawees of the bills. Palmers, Mackillop, Dent & Co. cannot then be charged with knowledge of the facts which were known by Wilson. Such being the case, the firm of Palmers, Mackillop, Dent &

Leavitt v. Blatchford.

Co. had no knowledge of the stock purchase, either actual or constructive, till after the presentment of the bills of exchange to them in London for acceptance.

The question then arises, how soon after such presentment they received notice. The letter of Beers was received on the 6th of April. In that letter no actual notice was given ; but it is contended that the reference which it makes to Wilson was of such a character as to put the drawees of the bills on their inquiry, and operated as constructive notice to them. It is not necessary to examine as to how far the rule in reference to constructive notice extends. For, if we adopt the rule laid down by the counsel for the plaintiff, that whatever is calculated to create a suspicion as to the legality of a transaction, is constructive notice of the nature of such transaction, still there would be nothing in this case to charge the drawees with constructive notice. The reference to Wilson was calculated rather to allay than excite suspicion. And it certainly could never have been supposed by Palmers, Mackillop, Dent & Co., when they were referred to the mutual friend of the parties for an explanation, which the letter evidently implies would prove satisfactory, that, on inquiry of their friend, it would be disclosed to them that the transaction was illegal. The same remarks are applicable to the letter of Davis.

If I am correct in these views, it follows that the first notice of the stock purchase which Palmers, Mackillop, Dent & Co. received, was that which was contained in the letter delivered by Murray to Palmer on the evening of the 7th of April. It becomes important here to ascertain what was the situation of the bills of exchange at that time. In the answer of Palmer, which, in this respect, is responsive, he says that the bills which had been presented, amounting in the aggregate to £33,500, had been accepted or agreed to be accepted. It appears that £19,000 were held by Huth & Co.; that £3500 were held by Masterman & Co., and that £11,000 were held by Palmers, Mackillop, Dent & Co. It also appears by the testimony of Maitland, the clerk of Palmers, Mackillop, Dent & Co., that the bills in their hands were accepted and passed

to the credit of the company, in consequence of the receipt of the letter of Beers, although he does not distinctly state whether this was done before or after Palmer's interview with Murray; and Murray states in his testimony that in his interview with Palmer, the latter stated that on the receipt of the letter of credit, and on the assurance of his friend Melville Wilson, as to the responsibility of Davis, he had sent notice to Huth & Co., and to Masterman & Co., that Palmers, Mackillop, Dent & Co. had decided to accept the bills held by them. It appears, then, that as to upwards of £20,000 of the bills drawn on them, Palmers, Mackillop, Dent & Co. had given notice of their intended acceptance before the receipt of Fletcher Wilson's letter.

It will be remembered that by the law of England a verbal acceptance of a foreign bill of exchange is binding. (*Chitty on Bills*, 172.) But it was contended, on the argument, that inasmuch as the bills of exchange had not been delivered up to the holders, after notice of their intended acceptance, and as there had been no express assent to the acceptance on the part of the holders, it was revocable; and that Palmers, Mackillop, Dent & Co. were not bound by it. (*See Story on Bills*, 252.) It is undoubtedly true, as a general rule, that an acceptance of a bill, not communicated to the holders, is revocable before the bill is delivered up. But is the rule the same where the acceptance is communicated, even although there is no delivery of the accepted bill? In the case of *Cox* v. *Troy*, (5 *Barn. & Ald.* 474,) Bayley, J. says, "It is not the mere act of writing on the bill, but the making a communication of what is so written, that binds the acceptor; for the making the communication is a pledge by him to the party, and enables the holder to act upon it." Can it then be said, with certainty, that in case the holders of the bills had insisted on the notice which they had received as a binding acceptance, Palmers, Mackillop, Dent & Co. could have successfully resisted such a claim? To say the least of it, the case admitted of a question. The holders of the bills might have made arrangements in their business, founded upon the notice which they had received; and even if Palmers, Mackillop, Dent & Co. were not legally

liable, still a regard for their faith as merchants would have required them to fulfil the promise which they had made, and upon which others had depended.

As to the bills which had not been presented at the time of the receipt of Wilson's letter, Palmers, Mackillop, Dent & Co. were uncommitted. But the letter of credit was an entire contract, and it would have been questionable how far the parties to it would have been liable to Palmers, Mackillop, Dent & Co. in case they had honored but a part of the bills drawn under it. It might possibly be that if immediately on the receipt of Wilson's letter, Palmers, Mackillop, Dent & Co. had countermanded the notice of acceptance, they would have escaped all legal liability. But if, in the embarrassing situation in which they then stood, they were induced to keep the promise which they had made, and in order to remove all legal question, thought it expedient afterward to accept the other bills drawn against the entire credit, can it be said that a claim thus created arose *ex turpi causa?* Particularly, when upwards of a month had elapsed after the illegal transaction had been consummated. It seems to me that neither law, equity, nor morality would require such a conclusion.

The question has frequently arisen in England, as to how far a contract for the repayment of money advanced by one party to another, to enable him to pay an illegal debt, could be enforced. In the case of *Faikney* v. *Reynous,* (4 *Burr.* 2069,) two persons had been jointly engaged in stock-jobbing transactions, and one of them had advanced money on behalf of the other, for compounding differences. It was held by Lord Mansfield that a suit could be maintained upon a bond given for the payment of the money advanced, on the ground that there was a new consideration. In the case of *Petrie* v. *Hannay,* (3 *T. R.* 419,) which was a similar transaction, it was held that the party who had advanced the money could recover it back, it having been advanced for the benefit of the other party, and with his privity and consent, and he having, subsequently to the advance, made an express promise of payment. In the case of *Booth* v. *Hodgson,* (6 *T. R.* 403,) which

also arose out of a stock-jobbing transaction, it was held that one partner who had advanced money for the benefit of another could not recover it back on an implied assumpsit, and the court then stated that an action could not be sustained, because on the whole case no promise could be implied except that which arose out of an illegal contract. In the case of *Auburt* v. *Maze*, (2 *Bos. & Pul.* 371,) where one partner had advanced money for the benefit of another, in payment of losses on illegal insurances, it was held that no action would lie; and the soundness of the distinction taken in the case of *Petrie* v. *Hannay*, between an express and an implied promise, was doubted. It will be remembered that in all these cases the party who advanced the money had been *particeps criminis* in the original illegal transaction.

There is another class of cases in which actions have been sustained for money advanced to a person, to enable him to pay a debt which had been illegally contracted, but where the lender was not a party to the illegal transaction. In the case of *Robinson* v. *Bland*, (2 *Burr.* 1077,) money lent to pay a gaming debt was held recoverable. A similar decision was made in *Alcinbrook* v. *Hall*, (2 *Wils.* 309.) See also *Carson* v. *Ranbat*, (2 *Bay*, 560.) In the case of *Armstrong* v. *Toler*, (11 *Wheat.* 258,) the English cases were reviewed by Ch. J. Marshall, and the rule which he deduced from them is, that where a contract grows immediately out of, and is connected with, an illegal or immoral act, it cannot be enforced. But if the promise is entirely disconnected with the illegal act, and is founded on a new consideration, it is not affected by the illegality of the act, although it was known to the party to whom the promise was made. Thus if the party who advanced the money knew that it was to be paid in discharge of a debt not recoverable at law, still he could maintain an action for its recovery. The case of *Cannon* v. *Bryce*, (3 *Barn. & Ald.* 179,) does not conflict with this rule. In that case money was lent to enable a party to pay an illegal debt, and the court held that it could not be recovered back by the lender. The ground of that decision was, that in the case then before the court, the

statute made the act of payment illegal, and the loan was consequently for the purpose of enabling a party to do an illegal act. But where the statute does not make the payment itself illegal, a promise founded on a loan to pay an illegal debt does not arise out of an illegal transaction, and is not connected with it, and the maxim *ex turpi causa non oritur actio* does not apply.

But if it should be admitted that money lent to pay an illegal debt cannot be recovered, still I think that the claim of Palmers, Mackillop, Dent & Co. can be sustained ; for as a question of fact, it seems to me that the loan made to the banking company was not only not made for the purpose of enabling it to purchase its own stock, but that it was not made for the purpose of enabling it to pay for stock already purchased. As has been before stated, it appears by the testimony of Strong, that the stock was purchased on the 28th of February, 1840, that it was paid for out of the proceeds of other bills than those drawn on Palmers, Mackillop, Dent & Co. before the bills drawn on them had been presented for acceptance. It must follow, then, that the bills were accepted, not to enable the company to pay an illegal debt, but to use the language of Murray, to save it from a "crisis in its affairs which would have compelled it to wind up." The officers of the company had placed it in such a situation, that the acceptance of the bills was necessary to prevent its prostration and ruin. It was in reference to this consideration, and for the purpose of avoiding a result which would have been so disastrous, that Palmers, Mackillop, Dent & Co. much against their wish, were forced to become the creditors of the company.

The next question to be considered, is, how far the North American Trust and Banking Company had the power to borrow money. The general banking law gives no such power in express terms. It specifies the general powers of banking associations, and then confers such incidental ones as shall be necessary to carry on their business under the powers specifically granted. Without reference to the banking law, it is a general fundamental principle, that when a right is given, all

powers are given which are necessary to the exercise and enjoyment of the right. Now, it cannot be questioned that a banking association may become indebted, in the exercise of its undoubted legitimate business. It has the right to receive deposits, and it must become indebted for them. It has the right to purchase gold and silver bullion, foreign coins and bills of exchange; and it may become indebted upon such purchase. It requires state stocks as a basis of its circulation; and it may lawfully contract a debt in the purchase of state stocks for that purpose. There may be other ways in which a banking association can become legally indebted. If it has the right to become indebted, it may become liable for the payment of its debts, at a time when, owing to disappointment, unexpected losses, or some unforeseen casualty, it has no available assets to meet its engagements. This emergency may occur in the soundest and best regulated association. The question then must arise, whether a solvent institution is to fail to meet its liabilities, and be broken up, and ruined, or whether it shall be permitted to substitute a credit for some convenient period of time, in the place of a debt then due and payable; or, in other words, whether it can substitute one creditor in the place of another. The power to borrow, then, is a necessary incident to the power to become indebted. It is a power without which no banking association could safely carry on its business.

It is contended, however, that the loan in this case was never authorized by the company. On reference to the articles of association it will be seen that all the powers, rights and privileges of the association were delegated to, and vested in a board of directors, and such officers and agents as they should appoint. (*Art.* 2, § 1, *p.* 50.) It was also provided, in the articles of association, that the board of directors should have authority to make such by-laws, rules and regulations for the management of the business of the association, as they might think expedient. (*Art.* 4, § 2, *p.* 51.) Under and in pursuance of these provisions, the directors adopted a set of by-laws, and divided all the business of the company into two departments. (*By-Laws,* §§ 1, 2, *p.* 55.) They then delegated the power to

conduct the business of one department to a committee of investments and finance, and the power to conduct the business of the other department to a committee of foreign and domestic exchange. (*By-Laws,* §§ 1, 2, 3, 4, *p.* 55.) All the business of the company was to be transacted by these two committees. In this distribution the general powers of the directors over the finances were conferred upon the committee of investments and finance—and the power to borrow money, assuming it to have existed, must have been a necessary incidental part of the power of that committee. By reference to the printed case, (p. 288,) it appears that on the 28th of February, 1840, a resolution was passed by the committee of investments and finance, instructing and authorizing the drawing of bills or the granting of credits upon Palmers, Mackillop, Dent & Co. In pursuance of this resolution, a letter was sent by Beers, the president of the company, to Palmers, Mackillop, Dent & Co. informing them that the banking company had authorized a credit in favor of Davis to the amount of £46,875. It was against this credit that the bills accepted by Palmers, Mackillop, Dent & Co. were drawn. The letter of credit was signed by Beers, as president of the company.

The general banking law provides that contracts made by any banking association shall be signed by the president or vice president and cashier. (*Laws of* 1838, *p.* 250, § 12.) It is contended on the part of the plaintiff in this suit, that the letter of credit, being signed only by the president, did not bind the company. It cannot be denied that, if it is to be treated as the contract between the parties, it was not executed as the law required that written contracts should be; but does it follow that the loan itself, the receipt of which was authorized by the association, through the proper committee, by a resolution duly passed and communicated to the lenders, does not create a liability on the part of the company? In the case of a deposit, the depositor does not, except in special cases, receive a written contract for repayment. In the present case, the claim of the lenders is not founded on the letter of credit; it is founded on the liability of the company to repay a sum of

money which it legally borrowed, and for which consequently, it became legally indebted.

The next questions which arise, are as to the legality of the promissory notes and of the agreement or trust deed.

It appears by the testimony, that the bills accepted by Palmers, Mackillop, Dent & Co. were twice renewed, and that on the 5th of October, 1840, and after the second renewal, but while the bills were running, Blatchford, their attorney in fact, addressed a letter to Davis, stating that they were desirous of having the credit closed, and that they were unwilling to continue it beyond the second renewal, then in progress. After the receipt of this letter by Davis, and the communication of its contents by him to the company, it was agreed between the parties that certificates of deposit to the amount of £48,000, should be given by the company to Palmers, Mackillop, Dent & Co. payable in twelve months after date, with the privilege of renewal for six months ; and that, as collateral thereto, certain securities should be assigned to Blatchford and Murray in trust. It was also agreed that Davis should give his bond for $110,000, which should constitute a part of the securities to be assigned, and that he should be released by Palmers, Mackillop, Dent & Co. In pursuance of this arrangement, and on the 30th of November, 1840, a resolution was passed by the committee of investments and finance, approving of the form of the proposed agreement, and authorizing the proper officers of the company to execute and deliver it, together with the certificates of deposit therein referred to, and to assign the securities mentioned in the schedule thereto annexed, and to do all other acts necessary to carry into effect the provisions of the agreement. In pursuance of this resolution, and on the day of its passage, the agreement was executed and delivered to Blatchford and Murray. It appears, however, that instead of certificates of deposite being delivered as agreed upon, promissory notes were issued to the amount of the indebtedness of the company, signed by the president and cashier, payable to the order of Cooke, in twelve months after date, and endorsed by him ; and it does not appear that certificates of deposite

were ever given. It is contended by the plaintiff that the agreement or trust deed thus executed is illegal and void.

The first objection which is made, is as to its execution. It has already appeared that it was approved by the committee of investments and finance, and that its execution was authorized by them. It also appears by reference to the instrument itself, that it was signed by the president and cashier pursuant to the provisions of the general banking law. The question then arises, whether the committee of investments and finance had the power to authorize its execution. The powers of this committee have already been examined, and it seems to me clear, that in the delegation of the powers of the directors, to the two committees, this power was conferred upon the committee which authorized the execution of the agreement. It is evident that the directors themselves supposed so, for there is no proof that any doubt or dissent was ever expressed by any one.

The next objections made by the plaintiff are to the agreement or trust deed itself. In the first place, it is contended that the promissory notes given by the company, being payable after date, are illegal and void. By the act of May 14, 1840, it is provided that no banking association shall issue or put in circulation any bill or note of such association, unless the same shall be payable on demand without interest. (*Laws of* 1840, *p.* 358.) It seems to me that the notes in · question are clearly void by the provisions of this statute. It was contended on the argument, on the part of the defendants, that the act refers only to notes intended to be put in circulation, and capable of circulating as money; and that the fact that these notes were drawn in large amounts, and made payable in London, in sterling money, shows that there was no such intention, and could be no such effect in this case. The answer to this is, that there is no such qualification in the statute. The object contemplated by the legislature, unquestionably, was to prevent the circulation, as money, of notes not payable on demand; but the method of effecting that object was to prevent the issuing of such notes absolutely, without

reference to the intention or effect of such issue.   But even if the qualification contended for should be adopted, it can hardly be said with certainty, that commercial ingenuity could not have devised some scheme by which the notes in question might have entered into the circulation of this state.   In the case of *Swift* v. *Beers*, (3 *Denio*, 70,) the qualification which has been suggested was expressly repudiated.   See also, *Ontario Bank* v. *Schermerhorn*, (10 *Paige*, 112.)

But it was farther contended on the part of the defendants, that even if the statute does apply to the notes in question, still the company is liable upon them, and the only effect of their issue is to subject the officers of the company to the penalty prescribed for the violation of the statute.   There are cases in which a penalty is imposed for doing an act where the act itself is not void.   These, however, are cases where the penalty is imposed merely for the purpose of revenue, and not where the act prohibited is against public policy.   (*Bartlett* v. *Vinor*, *Carthew*, 252.   *De Begnis* v. *Armistead*, 10 *Bing*. 107.   *Foster* v. *Taylor*, 3 *Nev. & Man*. 244 ; *S. C.* 5 *B. & Ad*. 887. *Ferguson* v. *Norman*, 5 *Bing*. *N. C.* 76.   *Hallett* v. *Novion*, 14 *John*. 290.   *Cope* v. *Rowlands*, 2 *Mees. & Wels*. 149. *Griffith* v. *Wells*, 3 *Denio*, 226.)   In this case the mischief intended to be prevented was the circulation of the notes of banking associations not payable on demand.   The person who receives them is supposed to know the law, and by receiving and aiding in the circulation he becomes *particeps criminis*.

By reference to the agreement, or trust deed, it will be seen that certificates of deposit, and not promissory notes, were to have been given by the company.   And Blatchford, the attorney of Palmers, Mackillop, Dent & Co. says in his answer, that he had the impression that they had been given, until a long time after the execution of the agreement.   I will suppose, however, for the present, that the promissory notes were substituted in the place of certificates of deposit, by consent of all the parties, or in other words, that the notes given are what it was intended should be given, but that they are miscalled in the agreement.   The question then arises, how far the illegality

of the notes renders the trust deed void. It is a well settled principle of law, that if there are different and distinct undertakings in the same contract, some of which are legal and some illegal, the law will sustain the good, and make void only the bad. "The common law is like a nursing father, and makes only void that part where the fault is, and preserves the rest." When the statute declares the instrument itself void, the rule is otherwise. Now, in this case, the indebtedness which the agreement was intended to secure was not created by the promissory notes—it already existed. The notes are merely evidences of it.

The object of the agreement was to secure the indebtedness, and not to secure the performance of an illegal contract. The notes extended the time for the payment of the debt of the company, and operated rather for its benefit than for the benefit of Palmers, Mackillop, Dent & Co. If the notes had been destroyed, the indebtedness would have remained. One of the evidences of indebtedness would be gone, and that is all. But suppose the promissory notes were a security, as they were called on the argument: the consequence then would be that, being illegal and void, Palmers, Mackillop, Dent & Co. would have one security less. It is well settled, that where there is a security given for the payment of a debt, although the security may be illegal and void, yet if in the same instrument there is a contract to pay the debt, the contract may be enforced. (*Mouys* v. *Leake*, 8 *T. R.* 411. *Kenison* v. *Cole*, 8 *East*, 231. *Ferguson* v. *Norman*, 5 *Bing. N. C.* 76. *Utica Insurance Company* v. *Kip*, 8 *Cowen*, 20.) And it necessarily follows, that if there are two securities for a debt, and one fails, the other is not affected. But it is said that the agreement in this case is, that the proceeds of the securities assigned shall not be paid over till there is a default in the payment of the notes, after they have been due, and that they being void *ab initio*, and therefore not capable of becoming due, the contingency upon which the trustees will be bound to pay over the proceeds of the securities will never occur.

There are two elementary principles applicable to all con-

tracts: first, that they must be construed according to their legal effect—and second, that they must be so construed *ut res magis valeat quam pereat*. Now, the object and intention of the agreement in question was to secure an existing indebtedness. The time when the notes were to become payable was fixed upon as a date when the right of Palmers, Mackillop, Dent & Co. to receive the proceeds of the assigned securities, should become absolute. As an evidence that such was the intention of the parties, the agreement itself acknowledges the indebtedness, and states that the company was desirous that the whole of it should rest on its responsibility, and that Palmers, Mackillop, Dent & Co. should make claim for it only against the company and against the securities agreed to be deposited for their indemnity. It was never intended by the parties that if, owing to any informality in the notes themselves, they should not be legally payable, the assignment of the securities should become void. Such was not the object and intention of the parties to the agreement, and such is not its legal effect. If for any cause other than the discharge of the indebtedness, the notes were not paid at the time when made payable, the rights of Palmers, Mackillop, Dent & Co. to the securities under the agreement became absolute.

But it is contended that, by the terms of the agreement, the securities are, in case of default, to be held for the benefit of the holders of the notes; and that by consequence any claim made by such holders must be made by virtue of the notes, and if they are void the claim must be void. It appears as a fact in the case, that all the notes are now held by Palmers, Mackillop, Dent & Co., and their agents. The original indebtedness existed and still exists in their favor; and it was to indemnify them that the trust deed was executed. Shall they then be permitted to lose the benefit of the indemnity because the agreement contemplated that the notes might be transferred to others, and intended in case of such transfer to indemnify the holders? The agreement says that after default shall be made in the payment of the notes, the securities shall be sold, and the proceeds shall be paid over to Palmers, Mackillop, Dent &

Leavitt *v.* Blatchford.

Co., or any other parties who shall then be holders of the certificates. The term "holders" is merely *descriptio personæ*, and if the holders of the notes are also the original creditors, for whose benefit alone the securities were assigned, shall it be said that they must lose the benefit of the securities, because a farther provision is made, which is not attempted to be enforced, and in reference to which, inasmuch as there has been no transfer of the notes, the question whether it can be legally enforced or not, does not, and cannot arise. The provision as to other persons than original creditors, is a distinct alternative undertaking, and ought not in equity to be permitted to destroy the claims of Palmers, Mackillop, Dent & Co.

But it is said that a court of equity cannot create a new security. This is unquestionably true, and if the construction which I have given has that effect, it cannot be sustained. In the case of *Hunt* v. *Rousmanier*, (3 *Mason*, 304,) which was cited on the argument, the true principle was laid down. In that case, the plaintiff, instead of taking a bill of sale of a vessel for his security, had taken a power of attorney authorizing the execution of a bill of sale. The reason given by him for doing so was, that he did not wish to take out new papers in his own name. After the execution of the power of attorney, and before any thing was done under it, the maker died. The plaintiff then claimed that the personal representatives of the deceased should execute a bill of sale; the court held, that as the plaintiff had refused to take a bill of sale, and had designedly taken a security of a different kind, which had become unavailable, they could not substitute a new security. That case differs widely from the present. Here nothing new is to be done. All that is necessary is to sustain what has been done, so far as it is legal, and to reject that which is illegal; to separate the sound from the unsound parts of the agreement.

I have hitherto considered this case as if the promissory notes were the certificates of deposit alluded to in the agreement. It now becomes necessary to consider what would be the effect upon the agreement in case they should not be so

regarded. The consequence, of course, would be that in this respect the agreement has not been performed. But a court of equity considers that done which ought to be done, and the agreement must be construed in the same manner as if certificates of deposit had been given to Palmers, Mackillop, Dent & Co. and were now held by them.

The next questions to be considered are: 1. Whether the agreement or trust deed was executed when the banking company was insolvent, or in contemplation of insolvency? 2. Whether it was executed with the intent to give a particular creditor a preference over other creditors of the company? It appears by the testimony, that the trust deed was executed on the 30th of November, 1840. It also appears that on the 1st of October, 1840, a committee was appointed by the company to examine into the condition of its affairs. On the 23d of December, in the same year, the committee reported. In their report they state that "the accounts of the company have been for some time past in a course of critical investigation, and that a statement has been made up to the 1st of October, 1840, since which period they have undergone little if any relative change." That report was signed by the committee, and published, and states a balance of available assets, over debts, amounting to $2,321,395,35. In opposition to this report, and for the purpose of showing its entire fallacy, and that the company was at that time insolvent, Strong, who was then a director of the company, was examined as a witness on the part of the plaintiff. His testimony is general. He states in reference to a portion of the assets, that he should "think probably one third were not collectable." In reference to other assets, he says that he "should think that but a small proportion was collected." The rest of his testimony is of the same indefinite character. Strong is the only witness on this point on whom the plaintiff relies, and it is from this testimony that we are to infer that the company was insolvent. It will be remembered, in considering how much weight is to be attached to the testimony, that in the autumn of 1840, the Commercial Bank of the city of New-York, of which the witness was at the time president, lent between

Leavitt *v.* Blatchford.

$39,000 and $40,000 to the company, and that the loan was made with his approbation and advice. It will also be remarked, that in or about the month of January, 1841, he was interested to the amount of at least one fourth in the purchase of from two to three thousand shares of the stock of the company; and what is more extraordinary, he, as one of the committee who had made a *critical investigation* of the affairs of the company, signed the report of the 23d of December, 1840, showing a surplus of upwards of $2,000,000, and published it to the world, with his assurance of its verity. There must generally be a difficulty in ascertaining what was the value of liabilities and things in action at any particular antecedent period. But certainly there can be a nearer approximation to it, and upon more satisfactory testimony, than is offered in this case.

The proof is equally unsatisfactory to show that the agreement in question was executed in contemplation of insolvency. The company did not stop payment until some months afterward, and all their acts show that at that time, not only its earnest hope, but its sincere expectation was, that it would avoid insolvency.

But irrespective of these considerations, it does not appear that any preference was intended, or has in fact been made, or that there are not now sufficient assets in the hands of the receiver to pay all the lawful debts of the company.

It is farther objected to the agreement, that it was made to hinder, delay and defraud creditors. Before examining this part of the case, I would remark that the decision which was made by the vice chancellor of the first circuit, in the case of *Leavitt* v. *Yates et al.*, does not apply to the instrument in question. In that case, the trust deed executed by the company to Yates and others, was made, not to secure debts previously contracted, but to secure future liabilities about to be contracted, and which might not be contracted for the period of thirteen months afterward. The property assigned was thus locked up in trust for that space of time, when there might not be, during the whole period, any *cestui que trust* who would acquire an interest in it. In this case there was an existing

indebtedness. The creditors, in very decided terms, announced their resolution not to continue the credit any longer in its then existing state. It was at that time, and for the purpose of obtaining an extension, and upon the additional consideration of the release of Davis, that the arrangement, which resulted in the execution of the trust deed, was entered into. The deed declares, that till default is made in the payment of the certificates of deposit, the property assigned shall be held in trust for the company. It is contended that, by this provision, the company became the sole *cestui que trust*, and that for that reason the trust is void. Such, however, is not the legal effect of the agreement. On the contrary, Palmers, Mackillop, Dent & Co. acquired an interest in the securities immediately on the execution of the deed. Not absolute, it is true, but as absolute an interest as a pledgee ever acquires before default, in property deposited as collateral security for the payment of a debt. The company could not resume possession or ownership of the securities assigned; neither could it control them. It could not make use of, nor receive the interest or profits arising from them. It had no greater interest in them, nor advantage arising out of them, than belongs to every pledgor. The case of *Goodrich* v. *Downs*, (6 *Hill*, 438,) was particularly relied upon, on the argument, in support of the views taken on behalf of the plaintiff. In that case, an insolvent debtor, against whom a judgment had been recovered, within the thirty days' stay of execution then allowed by law, assigned nearly all his property to his son, to pay four of his creditors, and to pay over the surplus, if there should be any, to himself. The court held that this was an attempt by an insolvent debtor to put his property beyond the reach of legal process, and at the same time to reserve a portion of it for his own benefit. The statement of this case shows that it is distinguishable from the one before us. In the first place, the assignor was admittedly insolvent, and a judgment recovered against him remained unsatisfied. In the next place, there were other creditors whose debts were then due, who were hindered and delayed by the assignment. In this case, on the contrary, it appears that the company paid its

accruing debts and liabilities till sometime after the execution of the deed. The only thing which distinguishes this from an ordinary case of a pledge, is that the persons who were to receive the benefit of it were not made the depositories of the property pledged. If they had been, they would have become trustees for the benefit of the pledgors, except to the extent of the security for their own debts. In this case, other persons are substituted as trustees for both parties.

But it is contended that the agreement is void, because the trustees, in addition to the right to sell the securities, also had a right to borrow money upon them in case of default. That is, they are authorized to substitute a new pledge in the place of the one created by the deed ; this would be the whole effect of borrowing money on the securities. Now if one pledge is legal, it is not obvious why a substitution of another contract, of precisely the same character, should not be equally so—certainly it ought not to vitiate the agreement itself.

The next question to be considered is as to the effect of the assignment of stocks of the Apalachicola Land Company, the American Land Company, and the Mississippi Land Company.

It appears from the testimony, that the Apalachicola stock was transferred to the company by Ogden, as security for his bond conditioned for the payment of $10,000—that the stock of the American Land Company was transferred to the banking company by Beers as security for his bond conditioned for the payment of $75,000—and that the Mississippi stock was transferred to the company by Sherwood as security for his bond conditioned for the payment of $30,000. It also appears that neither of the bonds was assigned to Blatchford & Murray. It is contended on the part of the plaintiff, that as the bonds of Ogden, Beers and Sherwood were never assigned, the stocks never passed to the assignees. Blatchford and Murray state in their answers that they were not aware that there were any such bonds. The company of course had no interest in the stocks, other than to the extent to which they were pledged as security for the payment of the bonds, and they could assign no other or greater interest. This interest they must have

Leavitt *v.* Blatchford.

intended to assign, and it must have been either through care-lessness, oversight or fraud, that the bonds were not assigned. The question then is, the bonds and stocks being separated, which shall follow the other ?   In respect to this matter, the receiver stands in the place of the company, and the question is to be decided in the same manner as it would be if this suit had been brought by the company.   The company intended to assign its interest in the stocks, and it was necessary, in order to make the transfer effectual, that the bonds should pass with them.   It follows, as a consequence, that the company ought to have assigned the bonds.   A court of equity considers that as done which ought to be done, and the bonds must be considered as having been assigned with the stocks—and this court should enforce an assignment in fact, if necessary.

The next question which arises is, as to the bond of Beers for $20,000.   This was not included in the list of securities set forth in the original report of the committee of investments and finance.   It appears to have been substituted in the place of another bond mentioned in that report; but in the final resolution of the committee authorizing the execution of the trust deed, it is stated that the form of the agreement in question was submitted to them for their approval, and that they thereby approved of it and authorized its execution, and also authorized the officers of the company to assign the securities mentioned in the schedule thereto annexed.   The bond of Beers is one of the securities mentioned in this schedule, and of course passed under the assignment.

Finally, it is contended that the original indebtedness of the company was founded on a usurious consideration.   The evidence relied upon as to this branch of the case is that Palmers, Mackillop, Dent & Co. charged a commission of one per cent, and in the first account which they rendered to the company charged 7 per cent interest.   Palmer says in his answer, which is responsive to the bill, that no agreement was made as to interest ; that the custom of his house in similar transactions was to charge one per cent more than the Bank of England charged at the same time, and that the rate of interest with

the Bank of England at the time of the transactions in question was five per cent. He farther states that the charge of seven per cent., contained in the first account, was made by a mistake of the clerk, and that on ascertaining the mistake, and before the commencement of this suit, the error was corrected and a new account furnished. It appears from the testimony that such corrected account was rendered. To make out a case of usury there must be a corrupt agreement, or in other words an agreement to reserve more than seven per cent. for the loan or forbearance of money. There is no proof in this case of any such agreement.

The conclusion from the views which have been expressed is, that the debt, to secure the payment of which the agreement or trust deed was given, was legally contracted, and is still due and payable; that the promissory notes given by the company being payable a year after date, were issued in violation of the provisions of the statute, and ought to be delivered over to the plaintiff to be cancelled; that the agreement or trust deed is legal and valid; and that all the securities mentioned in the schedule annexed to it passed to the trustees, subject to the trusts contained in the deed, and a decree must be entered to that effect. A provision must also be made in the decree for the payment of the costs of the defendants out of the proceeds of the assigned securities, and that the costs of the plaintiff be a charge against the assets of the company in his hands as receiver.(*a*)

(*a*) The above decision was affirmed in part and reversed in part, by the court of appeals at the December term, 1849. That court decided that the trust deed and accompanying securities were illegal and void, on the ground that they were made in violation of the act of 1840. The other questions which had been discussed in the cause were not decided, but were left to be disposed of in the suit in which the receiver was appointed.